**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 5, 2012

No. 10-20640

Lyle W. Cayce
Clerk

TECHNICAL AUTOMATION SERVICES CORP.,

Plaintiff - Appellee

v.

LIBERTY SURPLUS INSURANCE CORPORATION,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before KING, JOLLY, and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Liberty Surplus Insurance Corporation appeals the summary judgment awarded to its insured, Technical Automation Services Corporation, holding that Liberty had a duty to defend Technical Automation in an underlying lawsuit. The parties consented to trial and entry of judgment by a federal magistrate judge. In granting summary judgment, the magistrate judge applied the "eight corners" rule of contract interpretation to determine the duty to defend, looking only to the complaint in the underlying lawsuit and the insurance policy. The magistrate judge therefore did not consider Liberty's defense of mutual mistake because Liberty's evidence created a factual dispute that was inappropriate to

No. 10-20640

determine the duty to defend. Accordingly, the court granted summary judgment for the insured, Technical Automation.

Furthermore, we have raised, *sua sponte*, a jurisdictional question relating to whether, in the light of *Stern v. Marshall*, the magistrate judge had authority under Article III of the Constitution to try and enter judgment in the state law counterclaim in this case. We hold that, notwithstanding *Stern*, the magistrate judge had jurisdictional authority.

With respect to the merits, we hold that the magistrate judge erred in not resolving whether a mutual mistake existed as to coverage and whether the policy should be reformed to expunge the disputed provision. We therefore reverse and vacate the summary judgment in favor of Technical Automation and remand for further proceedings not inconsistent with this opinion.

I.

A.

From 2003 to 2004, Liberty was Technical Automation's general commercial liability insurer. The 2003 insurance policy provided a basic coverage form that set forth the essential terms of the policy. It also included various endorsements that amended or supplemented the basic coverage form. Endorsement nineteen was identified as form number "ES 344 EG/RH" and entitled "Exclusion-Professional Liability." It provided that: "with respect to any professional services shown in the schedule, this insurance does not apply to 'bodily injury,' 'property damage,' 'personal injury,' or 'advertising injury' due to the rendering of or failure to render any professional service."

In late 2003, Technical Automation sought to renew its coverage with Liberty for another year. After providing Technical Automation with a policy

2

No. 10-20640

renewal quote and an insurance binder, Liberty issued commercial general liability policy number "DGL-BO-199658-023" to Technical Automation, for the period of February 21, 2004 to February 21, 2005.  The basic policy stated that Liberty was obligated to defend Technical Automation against any suit seeking damages covered by the terms of the insurance policy because of "bodily injury" or "property damage" that occurred during the policy period.  The policy's schedule of forms and endorsements identified endorsement nineteen as form number "ES 344" entitled "Exclusion-Professional Liability," an exclusion that would make the terms of the new policy identical to the 2003-2004 policy.  In the actual policy document, however, endorsement nineteen was not an exclusion, but appeared as a "Miscellaneous Errors and Omissions Endorsement" ("E&O endorsement"), which was identified as form number "CGL 1204 0103."  This endorsement provides:

> Subject to the conditions and exclusion in the Coverage Part, the coverage afforded by this endorsement shall apply to those sums which you shall become legally obligated to pay as damages as a result of any negligent act, error or omission committed by you, that results in "bodily injury" or "property damage" committed during the policy period in the conduct or operations shown in the Schedule above.

### B.

We now turn to the incident that provoked this coverage dispute.  In 2005, Technical contracted with Oxy Vinyls (Oxy) to inspect and to remove a chlorine flow transmitter and to install a new transmitter at Oxy's Deer Park Caustic Plant.  Technical completed its work on February 17, 2005, during the policy's liability coverage.  On February 24, 2005, three days after Technical

3

No. 10-20640

Automation's policy with Liberty expired, an Oxy employee, Juan Valdovinos,[1] was injured by a chlorine leak at the Oxy plant.  In 2007, Valdovinos brought a personal injury suit against Technical Automation and Oxy alleging negligence by both companies.  Valdovinos specifically alleged that Technical failed to calibrate the new transmitter properly and that Oxy did not provide adequate safety measures in the event of a chlorine leak.

Technical Automation first tendered a request for defense and indemnity for the Valdovinos suit to Twin City Fire Insurance Company (Twin City), which was Technical Automation's liability insurer on the date that Valdovinos was injured.  Twin City denied coverage based on a limited pollution exclusion in Technical Automation's insurance policy.  As a result of the denial of its claim by Twin City, Technical Automation submitted defense and indemnity claims to Liberty.  In consequence, Oxy also tendered defense and indemnity claims to Liberty.  On October 15, 2008, a representative from Liberty International Underwriters denied coverage for the Valdovinos lawsuit on behalf of Liberty, claiming that Valdovinos's injury did not occur until after the policy period had expired.

On March 2, 2009, Technical Automation filed suit in the Harris County District Court seeking a declaratory judgment stating that Liberty had the duty to defend and indemnify Technical Automation in the Valdovinos suit; it also sought damages for breach of contract.  Oxy intervened in the state court action, also asserting claims for a declaratory judgment and breach of contract as an additionally insured party.  On April 14, 2009, Liberty removed the case to the

---

[1] We are adopting the spelling "Valdovinos," because it is the way it is spelled by the parties in their briefs and filings in the trial court.  He is also occasionally referred to as "Valdavinos," including in the magistrate judge's memorandum and final order.

4

No. 10-20640

United States District Court for the Southern District of Texas, on the grounds that the complaint alleged complete diversity of citizenship and the amount in controversy was more than $75,000.

On November 18, 2009, Technical Automation moved for partial summary judgment. It argued that Liberty was obligated to defend Technical in the Valdovinos suit, because Valdovinos raised a claim for negligence that was covered by the E&O endorsement in the liability policy. On February 19, 2010, Liberty opposed Technical Automation's motion and, in the same document, Liberty moved for summary judgment on the basis that the inclusion of the E&O endorsement was a mutual mistake and sought reformation of the contract. It also argued that it had no duty to defend Technical Automation because Valdovinos's alleged injuries took place after the policy had expired.

C.

We now review the trial court proceedings. As we have said, the parties consented, under 28 U.S.C. § 636(c) of the Federal Magistrates Act, to a United States magistrate judge handling all further proceedings. The magistrate judge was thus responsible for determining Technical Automation's breach of contract, duty to defend, and duty to indemnify claims; Oxy's third party claims; and Liberty's reformation counterclaim. On May 17, 2010, the magistrate judge issued a memorandum opinion and an order on the cross-motions for summary judgment. The court addressed the "eight corners" rule of contract interpretation, and it seems that, on the basis of the eight corners rule, the court reasoned that, when determining the duty for an insurer to defend, it could not consider any matter not reflected in the complaint in the underlying lawsuit or the liability policy. Thus, because the magistrate judge concluded that "there

No. 10-20640

is a genuine issue of material fact on whether an original agreement existed" with respect to Liberty's defense of mutual mistake and its reformation counterclaim and that it could not look to extrinsic evidence to establish the contents of the original agreement, the court denied Liberty's motion for summary judgment. The court then turned to interpret the E&O endorsement in the light of the complaint in the Valdovinos lawsuit; and it determined that the endorsement was ambiguous and construed the endorsement in favor of Technical Automation, the insured. Accordingly, the court held that the E&O endorsement extended the coverage of the liability policy to include "bodily injury" occurring after the policy period, if the alleged negligent acts or omission occurred during the policy period. The magistrate judge subsequently granted summary judgment to Technical Automation, holding that Liberty had a duty to defend. However, the court found that it was premature to rule on whether Liberty owed Technical Automation indemnification. Lastly, the court granted Liberty's motion for summary judgment regarding Oxy's claims, holding that Oxy was not a named insured under the contract.

On June 8, 2010, the magistrate judge, acting under the authority of Rule 20 of the Federal Rules of Civil Procedure, entered an order severing certain specific claims and a final judgment with respect to all other claims. The order severed Technical Automation's remaining indemnification claim from the claims regarding Liberty's duty to defend Technical Automation and Liberty's duty to defend and indemnify Oxy. With respect to all of the claims except for Liberty's indemnification claim, the court entered a final judgment in favor of Technical Automation finding that Liberty had a duty to defend Technical

6

No. 10-20640

against the claims asserted in Valdovinos's lawsuit, and it entered final judgment in favor of Liberty on all of Oxy's third-party claims.

On July 6, 2010, Liberty moved to alter the court's final judgment on the severed claims, arguing that the trial court had not yet resolved whether it was entitled to reformation. On August 17, 2010, the magistrate judge issued an order that reiterated her holding that Technical Automation was entitled to summary judgment on the issue of Liberty's duty to defend, asserting that "no evidence existed to show that the policy should be reformed to nullify the disputed endorsement." Liberty timely appealed the judgment that it had a duty to defend Technical Automation, and the magistrate judge stayed any further proceedings on the indemnification claim pending this appeal.

II.

This case was originally assigned to the argument calendar of Judges Garwood, Smith, and Stewart.  Shortly before the death of Judge Garwood, the Supreme Court rendered its decision in *Stern v. Marshall*, which called into question whether it is constitutional for a magistrate judge to render final judgment over state-law counterclaims. For administrative reasons, the case was subsequently reassigned to the calendar of this panel.  The two questions presented to us are: first, whether Article III of the Constitution permits a federal magistrate judge, with the consent of the parties, to enter final judgment on a party's state law counterclaim and, second, whether the magistrate judge erred by entering summary judgment in favor of Technical Automation before properly considering Liberty's mutual mistake and reformation claim.

No. 10-20640

## A.

First, we will resolve the jurisdictional issue and examine the impact of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), on whether magistrate judges have the constitutional authority to enter final judgment under the Federal Magistrates Act in cases involving state-law counterclaims.

Here, a federal magistrate judge entered summary judgment on Liberty's reformation counterclaim based on her authority under 28 U.S.C. § 636(c)(1), which provides, in pertinent part, that "[u]pon the consent of the parties, . . . [a] United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order entry of judgment in the case."[2]  A previous panel of this court ruled that § 636(c) did not allow magistrate judges to improperly "exercise powers reserved under the Constitution to Article III judges." *Puryear v. Ede's Ltd.*, 731 F.2d 1153, 1154 (5th Cir. 1984).  The panel explained that the Magistrates Act is "saved from any constitutional infirmity by its requirement that all parties consent to such transfer and by the power of the

---

[2] Stated in its entirety, 28 U.S.C. § 636(c)(1) provides:

 Upon the consent of the parties, a full-time United States magistrate judge or a part-time United States magistrate judge who serves as a full-time judicial officer may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves. Upon the consent of the parties, pursuant to their specific written request, any other part-time magistrate judge may exercise such jurisdiction, if such magistrate judge meets the bar membership requirements set forth in section 631(b)(1) and the chief judge of the district court certifies that a full-time magistrate judge is not reasonably available in accordance with guidelines established by the judicial council of the circuit. When there is more than one judge of a district court, designation under this paragraph shall be by the concurrence of a majority of all the judges of such district court, and when there is no such concurrence, then by the chief judge.

No. 10-20640

district court to vacate the reference to the magistrate on its own motion." *Id.* (citing 28 U.S.C. § 636(c)(1),(6)). The panel also noted that "[e]ach circuit facing this question has reached a similar conclusion."[3] *Id.*

Because a previous panel has resolved this question, we cannot overturn its decision "absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court or by our *en banc* court." *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (citing *United States v. Simkanin*, 420 F.3d 397, 420 n. 25 (5th Cir. 2005)). In particular, for a Supreme Court decision to change our Circuit's law, it "must be more than merely illuminating with respect to the case before [the court]" and must "unequivocally" overrule prior precedent. *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001) (internal quotation marks and citation omitted); *United States v. Zuniga-Salinas*, 945 F.2d 1302, 1306 (5th Cir. 1991) (holding that a panel of this court can overrule a prior panel only if "such overruling is unequivocally directed by controlling Supreme Court precedent"); *see also United States v. Short*, 181 F.3d 620, 624 (5th Cir. 1999).

B.

In the light of our prior panel precedent and our observance of the rule of orderliness, our inquiry turns to whether the Supreme Court's decision in *Stern v. Marshall*, unequivocally, *sub silentio* overruled *Puryear*. In *Stern*, the Supreme

---

[3] *See Bell & Beckwith v. United States*, 766 F.2d 910 (6th Cir. 1985); *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281 (4th Cir. 1985); *D.L. Auld Co. v. Chroma Graphics Corp.*, 753 F.2d 1029 (Fed. Cir. 1985); *Fields v. Washington Metro. Area Transit Auth.*, 743 F.2d 890 (D.C. Cir. 1984); *Geras v. Lafayette Display Fixtures, Inc.*, 742 F.2d 1037 (7th Cir. 1984); *Lehman Bros. Kuhn Loeb Inc. v. Clark Oil & Ref. Corp.*, 739 F.2d 1313 (8th Cir. 1984); *Collins v. Foreman*, 729 F.2d 108 (2d Cir. 1984); *Goldstein v. Kelleher*, 728 F.2d 32 (1st Cir. 1984); *Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*, 725 F.2d 537 (9th Cir. 1984) (en banc); *Wharton-Thomas v. United States*, 721 F.2d 922 (3d Cir. 1983).

No. 10-20640

Court held that although Article I bankruptcy courts are authorized by Congress under 28 U.S.C. § 157(b)[4] to issue a final judgment on a state law counterclaim asserted by a debtor, bankruptcy courts lack constitutional authority to enter final judgment when the counterclaim did not "stem[] from the bankruptcy itself

---

[4] In full, § 157(b)(1)-(2) provides:

(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to—
(A) matters concerning the administration of the estate;
(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
(C) counterclaims by the estate against persons filing claims against the estate;
(D) orders in respect to obtaining credit;
(E) orders to turn over property of the estate;
(F) proceedings to determine, avoid, or recover preferences;
(G) motions to terminate, annul, or modify the automatic stay;
(H) proceedings to determine, avoid, or recover fraudulent conveyances;
(I) determinations as to the dischargeability of particular debts;
(J) objections to discharges;
(K) determinations of the validity, extent, or priority of liens;
(L) confirmations of plans;
(M) orders approving the use or lease of property, including the use of cash collateral;
N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;
(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and
(P) recognition of foreign proceedings and other matters under chapter 15 of title 11.

or would necessarily be resolved in the claims allowance process." *Stern*, 131 S. Ct. at 2618. The Court's decision hinged on the separation of powers mandated by Article III of the Constitution, which requires that the judiciary be "truly distinct from both the legislature and the executive." *Id.* at 2608 (quoting The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton)). Accordingly, the Court reaffirmed that Congress may not withdraw "from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Id.* at 2612 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856)). The Supreme Court emphasized that even the slightest "chipping" away of Article III can lead to "illegitimate and unconstitutional practices," and accordingly held that the jurisdiction of the bankruptcy courts did not extend to most counterclaims based on common law. *Id.* at 2620.

This holding can be translated to the many similarities of the statutory powers of federal magistrate judges. Whereas Article III judges "hold their offices during good behavior, without diminution of salary," bankruptcy judges and federal magistrate judges are Article I judges who lack tenure and salary protection. *Stern*, 131 S. Ct. at 2600-01 (citing U.S. Const. art. III, § 2). Moreover, the text of 18 U.S.C. § 157(b) (the statute addressed in *Stern*) and the text of the Magistrates Act, 28 U.S.C. § 636(c), allow Article I judges to enter final judgments, allow for judges' final judgment to be binding without further action from an Article III judge, entitle the decisions to deference on appeal, and permit the courts to exercise "substantive jurisdiction reaching any area of the *corpus juris*." *Id.* at 2615.

No. 10-20640

Although the similarities between bankruptcy judges and magistrate judges suggest that the Court's analysis in *Stern* could be extended to this case, the plain fact is that our precedent in *Puryear* is there, and the authority upon which it was based has not been overruled.  Moreover, we are unwilling to say that *Stern* does that job *sub silentio*, especially when the Supreme Court repeatedly emphasized that *Stern* had very limited application.  *Id.* at 2620 (emphasizing the limited scope of the decision, saying that the issue addressed was a "narrow one" that related only to "certain counterclaims in bankruptcy") (internal quotation omitted); *see also id.* ("Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protection set forth in that Article.  We conclude today that Congress, *in one isolated respect*, exceeded that limitation in the Bankruptcy Act of 1984.") (emphasis added).  Article III jurisprudence is complex, requiring the court to do an examination of every delegation of judicial authority. *See generally*, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 847 (1986) (noting that "precedents in this area do not admit of easy synthesis"); *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 91 (1982) (Rehnquist, J., concurring) (referring to prominent Article III cases as "but landmarks on a judicial 'darkling plain' where ignorant armies have clashed by night"). Notwithstanding that this constitutional question may be seen in a different light post *Stern*, we will follow our precedent and continue to hold, until such time as the Supreme Court or our court *en banc* overrules our precedent, that federal magistrate judges have the constitutional authority to enter final judgments on state-law counterclaims.

No. 10-20640

III.

A.

Now that we have settled that the magistrate judge had the necessary authority to try and enter judgment in this case, we will consider the merits of this appeal. On appeal, Liberty does not challenge the magistrate judge's interpretation of the E&O endorsement; instead, Liberty argues that the magistrate judge erred by prematurely engaging in her interpretation of the endorsement, before determining whether the endorsement was a result of mutual mistake. According to Liberty, the E&O endorsement was included in the policy by mutual mistake, and a genuine issue of fact remains as to whether it was entitled to have the E&O endorsement expunged through reformation.

We review a district court's grant of summary judgment *de novo*, which means that we apply the same standard as the district court when deciding whether summary judgment was properly granted. *Makedwde Publ'g Co. v. Johnson*, 37 F.3d 180, 181 (5th Cir. 1994) (citing *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 975 (5th Cir.1991)). Summary judgment is appropriate only "when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the court establish that there are no genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law." *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995) (citations omitted); *see also* FED. R. CIV. P. 56(c). The moving party has the burden of demonstrating that there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If a party can prove that a contract is the result of mutual mistake, it may be entitled to the equitable remedy of reformation. *Fidelity & Cas. Co. of N.Y. v. Ind. Lumbermen's Mut. Ins. Co.*, 382 F.2d 839, 843 (5th Cir. 1967) (utilizing

13

No. 10-20640

Texas contract law). In the course of reformation, obligations to which the parties have not assented in reaching the original agreement are expunged by the court. "The underlying objective of reformation is to correct a mutual mistake made in *preparing* a written instrument, so that the instrument truly reflects the *original* agreement of the parties." *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987) (internal citations omitted). Thus, reformation requires (1) an original agreement and (2) a mutual mistake that occurred when reducing this agreement to writing. *Id.*

## B.

We now proceed to the magistrate judge's analysis of Liberty's reformation claim.[5] The magistrate judge found that the record demonstrated a "fact question on whether there was an 'original agreement' to exclude the E&O coverage." Then, applying the "eight corners" rule of contract interpretation and declining to consider parol evidence,[6] the magistrate judge truncated her mutual mistake analysis, denied Liberty's motion for summary judgment, accepted, for purposes of the duty to defend, the E&O endorsement as a valid part of the contract, interpreted the endorsement in favor of Technical Automation, and granted Technical Automation's motion for summary judgment declaring that Liberty had a duty to defend.

---

[5] Our analysis is primarily focused on the rationale of the summary judgment order itself and not any amended reasoning by way of the magistrate judge's subsequent orders. *But see infra* note 7.

[6] The magistrate judge did not explicitly tie the "eight corners" rule to her failure to consider Liberty's reformation claim; however, discussing the rule at length, she surely implicitly did so as is evidenced by her exclusion of parol evidence, her refusal to resolve a disputed issue of fact, and ultimately her severing the claim as irrelevant to the duty to defend. In short, it is unclear how, without applying the "eight corners" rule, she could conclude that there was an issue of fact remaining based on the evidence and not allow the parties to move forward with resolving the claim.

No one doubts that, generally, Texas subscribes to the "eight corners" rule when deciding an insurer's duty to defend under an insurance liability policy, which means that courts are permitted to examine only the insurance contract and the complaint against the insured in the underlying suit to determine whether there is coverage for the insured. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006). There is a relevant exception, however.

When a mutual mistake is alleged, the first task of the court is not to apply, perfunctorily, the "eight corners" rule and then directly proceed to interpret the insurance policy. Instead, the first matter to address is whether the disputed provision results from an agreement between the parties. *Williams v. Glash*, 789 S.W.2d 261, 265 (Tex. 1990) ("When mutual mistake is alleged, the task of the court is not to interpret the language contained in the release, but to determine whether or not the release itself is valid."). Furthermore, the parol evidence rule does not apply when a court is determining whether there was a mutual mistake, even if the contract is unambiguous or fully integrated. *Marcuz v. Marcuz*, 857 S.W.2d 623, 627 (Tex. App.– Hous. [1st Dist.] 1993, no writ) ("The fact that the written instrument is couched in unambiguous language, or that the parties knew what words were used and were aware of their ordinary meaning, or that they were negligent in failing to discover the mistake before signing the instrument, will not preclude the admission of parol evidence or relief by reformation."). In fact, the claim of mutual mistake usually requires the introduction of extrinsic evidence, because a substantive mistake and the original agreement between the parties would rarely be readily apparent based on the terms of the contract itself. *See id.* ("Here, Luciano offered the excluded evidence

in an attempt to prove a mutual mistake occurred and to prove the true intent of the parties. *Under those circumstances, the parol evidence was admissible.*").

Thus, the magistrate judge erred by applying the "eight corners" rule to Liberty's reformation counterclaim. The introduction of conflicting evidence as to whether the E&O endorsement was part of and included in the original agreement between the parties should not have ended the court's mutual mistake inquiry; it should have begun it.[7] *See id.* Because resolving the mutual mistake could expunge the endorsement provision from the policy, the court should have resolved the allegations of mutual mistake before interpreting the terms of the contract.

In sum, the magistrate judge erroneously applied the "eight corners" rule before considering Liberty's reformation counterclaim and prematurely interpreted the E&O endorsement. Thus, a genuine issue of material fact remains as to whether the E&O endorsement was included in the insurance policy by mutual mistake, which could entitle Liberty to reformation of the policy.

---

[7] The magistrate judge's order denying Liberty's motion for reconsideration can be read to contradict the rationale of her original summary judgment order. The first order clearly held that there was a disputed issue of fact as to whether there was an original agreement. In the second order, the magistrate judge, considering *only* the policy binder against the testimony of John Burkland, Technical Automation's president, states that Liberty had not proved that there was an original agreement to "exclude the E&O endorsement." Implicit in restricting her comments to the policy binder is her rejection of the admission of Liberty's other evidence of mutual mistake. Morever, the magistrate judge seems to have resolved the disputed issues of fact, crediting the testimony of Mr. Burkland. Still further, the magistrate judge seems to misperceive Liberty's claim of mutual mistake, referring to an original agreement "to exclude the E&O endorsement;" Liberty's claim is that the original agreement simply had no E&O provision in its contents. In any event, under either rationale of the magistrate judge's first or second order, the magistrate judge erred in granting summary judgment in favor of Technical Automation on the duty to defend question.

No. 10-20640

IV.

To review our decision, we hold that *Stern v. Marshall* has not overruled prior precedent holding that it is within the jurisdictional authority of magistrate judges to enter final judgment on state-law counterclaims, when the parties consent thereto. Furthermore, we hold that a genuine issue of material fact exists as to whether Liberty is entitled to reformation of the insurance policy on the basis of mutual mistake. Summary judgment holding that Liberty had a duty to defend was therefore not appropriate or, at least, certainly not at that time. The trial court must first resolve whether the E&O endorsement provision was the result of a mutual mistake and whether Liberty is entitled to reformation of the policy to expunge said provision.

Accordingly, we REVERSE and VACATE the judgment of the magistrate judge and REMAND for further proceedings, not inconsistent with this opinion.

REVERSED, VACATED, and REMANDED.

17